JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| MARK RUBENSTEIN, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | CLASS ACTION |
| OILSANDS QUEST INC. (f/k/a CANWEST PETROLEUM CORPORATION), CHRISTOPHER H. HOPKINS, T. MURRAY WILSON, GARTH WONG and KARIM HIRJI, | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Defendants. | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      Plaintiff, Mark Rubenstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Oilsands Quest Inc. (f/k/a Canwest Petroleum Corporation), as well as media reports about the Company.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities class action on behalf of all persons or entities who acquired the common stock and other securities of Oilsands Quest Inc. ("Oilsands Quest" or the "Company") between August 14, 2006 and July 14, 2009, inclusive (the "Class Period"), including those who acquired Oilsands Quest "Exchangeable Shares" offered as consideration for the minority interest in OQI Sask on August 14, 2006; the Oilsands Quest "units" publicly offered on December 5, 2007 at $5.00 per unit (comprised of one share of common stock and one-half of a share of common stock purchase warrant with each whole warrant entitling the holder to purchase one share of common stock of the Company for $6.75 per share until December 5, 2009); the shares of common stock publicly offered on December 5, 2007 on a flow-through basis at a price of $6.11 ($6.17 CDN); and the "units" publicly offered on May 1, 2009 at $0.85 per unit (comprised of one share of common stock and one-half of a share of common stock purchase warrant with each whole warrant entitling the holder to purchase one

share of common stock of the Company for $1.10 per share until May 12, 2011), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Though Oilsands Quest is a Colorado corporation headquartered in Alberta, Canada, the Company conducts business in this District, including conducting multiple Class Period stock offerings in this District, and its common stock trades on the American Stock Exchange ("AMEX") which is located in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Mark Rubenstein, as set forth in the accompanying certification, which is incorporated by reference herein, purchased common stock of Oilsands Quest at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Oilsands Quest, Inc. ("Oilsands Quest") is a is a Colorado corporation with its corporate headquarters located at 800, 326 - 11th Avenue SW, Calgary, Alberta, Canada T2R 0C5.  The Company was formed on April 3, 1998 as Uranium Power Corporation.  On November 2, 2004, its name was changed to CanWest Petroleum Corporation ("Canwest").  On

October 31, 2006, its name was changed to Oilsands Quest Inc.  The Company operates through its wholly-owned operating subsidiaries, primarily through Oilsands Quest Sask Inc. ("OQI Sask"), an Alberta, Canada corporation established as an operating subsidiary of the Company to explore for and develop oil sands deposits in the provinces of Saskatchewan and Alberta, Canada.

8.      Defendant Christopher H. Hopkins ("Hopkins") served as a director, Chief Executive Officer ("CEO") and President of the Company during the Class Period, serving as a director from August 14, 2006 to the present; as CEO from August 14, 2006 until he resigned January 15, 2009; and as President from August 14, 2006 until September 15, 2008.  Defendant Hopkins was also the President, CEO and a director of Oilsands Quest Sask Inc. ("OQI Sask"), the Company's primary operating subsidiary, from November 10, 2004 to January 15, 2010.

9.      Defendant T. Murray Wilson ("Wilson") served as a director, Chairman of the Board, CEO, President and Chief Financial Officer ("CFO") of the Company during the Class Period, serving as Chairman since May 1, 2006 and Executive Chairman since August 14, 2006, and as President, CEO and CFO from May 1, 2006 until August 14, 2006.  On January 15, 2010, Wilson resumed the roles of CEO and President of Oilsands Quest.

10.      Defendant Garth Wong ("Wong") served as Oilsands Quest's CFO from February 23, 2009 until February 1, 2011 and now serves as its President and CEO.  Previously, Wong worked at KPMG, Oilsands Quest's outside auditor.

11.      Defendant Karim Hirji ("Hirji") served as CFO of Oilsands Quest from August 14, 2006 to February 23, 2009.  Hirji also served as CFO of OQI Sask from November 10, 2004 until February 23, 2009.

12.    The Defendants referenced above in ¶¶8-11 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

13.    As officers and controlling persons of a publicly held company whose common stock was, and is, traded on the AMEX and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Oilsands Quest, each of the Individual Defendants had access to the adverse undisclosed information about Oilsands Quest's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Oilsands Quest and its business or adopted by the Company materially false and misleading.

15.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Oilsands Quest common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Oilsands Quest's business, operations, management and the intrinsic value of Oilsands Quest common stock; (ii) permitted defendants to sell tens of millions of dollars worth of Oilsands Quest shares in registered offerings and private placements during the Class Period; (iii) allowed Oilsands Quest to purchase the minority interest in OQI Sask using inflated shares during the Class Period; (iv) allowed Oilsands Quest to obtain a listing on the AMEX during the Class Period; and (v) caused Plaintiff and other members of the Class to purchase Oilsands Quest common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired Oilsands Quest common stock and other securities during the Class Period (the "Class").

Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Oilsands Quest common stock was actively traded on the AMEX.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Oilsands Quest or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the Exchange Act was violated by Defendants as alleged herein;

        (b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Oilsands Quest; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

22.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

23.      CanWest was formed in 1998 by Timothy Brock ("Brock"), a Vancouver investor who in 2003 admitted to conducting 37 "wash trades," where he was at the same time a buyer and seller of shares in companies in which he was a director, including in War Eagle Mining.  As part of his settlement of an enforcement action in Canada, Brock was banned by the British Columbia Securities Commission from being a director or officer of any public company until 2008.

24.      In 2004 CanWest bought 49% of what later became a 850,000 acre Saskatchewan oil sands prospect and an option for the rest.  CanWest called the property Firebag East, mimicking Suncor Energy's well-known Firebag project, some 30 miles away.  To legitimize the effort, Brock recruited Hopkins, co-founder of a previous oil sands success story, Synenco Energy.  Hopkins did not join CanWest but formed another company, OQI Sask, which acquired CanWest's Saskatchewan property for 70% of OQI Sask's shares, which was later reduced to 60%.

25.     On August 14, 2006, Oilsands Quest would acquire the remaining non-controlling (minority) interest of OQI Sask.  Following this acquisition, OQI Sask's executive team, including defendants Hopkins and Hirji, would be appointed as Oilsands Quest's executive team.

26.     The Company's common stock would commence trading on the AMEX on August 24, 2006 under the symbol BQI.  Prior to that date, the Company's common stock was traded on the NASD OTC Bulletin Board under the symbol CWPC.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED PRIOR TO THE START OF THE CLASS PERIOD THAT REMAINED "ALIVE IN THE MARKET" DURING THE CLASS PERIOD

27.     On March 20, 2006, defendants issued a release entitled "Firebag East Oil Sands Project Updated Information," stating that Hopkins had been "interviewed by a leading Saskatchewan news paper, the Leader-Post which published the interview Monday, March 20, 2006," and that "CanWest Petroleum Corporation is supportive of his preliminary views as to the project's *ultimate* potential."   The Company's March 20, 2006 release also stated that "Dr. Michael Berry, a paid consultant of CanWest's, reported on the Company's progress at Firebag East in his 'Morning Notes' which includes a speech from the Saskatchewan Government Legislature as well as a picture of bitumen core recently recovered from the Phase One drilling program," and that "[b]oth articles have been posted on the Company's web site www.canwestpetroleum.com under 'what's new'."   The *Saskatchewan Leader Post* article run that day cited very positive guidance concerning the development of Firebag East and the billions of barrels of bitumen the Company would extract from the region:

> How big could Saskatchewan's oilsands development get?
>
> "If our geological model proves out, after an extensive, exhaustive drilling program, *our current thinking is there could be 50 (billion) to 60 billion barrels of bitumen (in place in northwestern Saskatchewan),''* said Terry Lauder, who handles corporate communications for Oilsands Quest.

While potential oil-in-place is not the same as recoverable barrels of oil, the northwestern Saskatchewan oilsands area is roughly one-fifth to one-third the size of the northern Alberta oilsands region around Fort McMurray.

> *"The potential, geologically, that we've identified is equivalent to 20 to 30 per cent of the Athabasca oilsands region. They say they've got roughly 300 billion barrels, so I'm saying (northwestern Saskatchewan) has roughly 60 billion barrels of potential oil in place,'' Hopkins said.*

[Emphasis added.]

28.     The favorable media coverage had its intended effect and the Company's stock price increased $1.18 per share that day – *23.6%* - on unusually high trading volume.

29.     On March 22, 2006, the Company filed its 3Q 06 Form 10QSB with the SEC for the interim financial period ending January 31, 2006.  The Consolidated Balance Sheets stated the Company had $15,614,256 in "properties," including:

(d) Firebag, Sask, Tar Sands Project

During the year ended April 30, 2005 the Company acquired a 49% interest in the Firebag, Saskatchewan prospect that covers approximately 2,000 square miles in northwestern Saskatchewan along the Alberta border. The prospective lands host Fort McMurray and Wabiskaw Palo channel zones containing Athabasca Oil Sands. This interest was acquired for $769,125 in cash, 50,000 common shares with a deemed value of $19,000 and a 2.5% gross overriding royalty.

The Company had another agreement to purchase the remaining 51% interest through the indirect purchase of 100% of the issued and outstanding shares of American Oilsands Company Inc., a private Alberta, Canada, company, for $1,202,131 plus 2 million common shares and $0.11 per barrel in royalties. Included in property costs for the year ended April 30, 2005 is non-refundable payment of $437,962 that the Company made towards this purchase and $640,000 related to the issuance of the 2 million common shares by the Company.

The 49% interest in the Firebag Saskatchewan prospect is held by the Company's subsidiary OQI. The Company, acquired OQI on September 24, 2004 and held all 100 of the issued and outstanding shares. In order to finance the purchase OQI borrowed $849,545 ($1 million CDN) from the Company by way of a convertible note. This convertible note is due September 29, 2008, bears interest at 3%. During the nine months ended January 31, 2006 the principal and interest were converted into 788,769 common shares of OQI.

> *In order to secure management, raise funds for the exploration of the project and the payment required for the remaining 51% of the project OQI issued 3 million OQI shares to OQI management and 6,999,900 OQI shares to the Company all at $.001 per share.*

[Emphasis added.]

30.     As to management's "Evaluation of Disclosure Controls and Procedures," the 3Q 06 Form 10QSB stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."

31.     On March 24, 2006, defendants issued a release announcing the Company had "retained TD Securities Inc. to act as its exclusive financial advisor and assist in the analysis and consideration of corporate and financial structures that [would] best allow CanWest to execute its oil sands exploration and development program," that TD Securities was "the recognized leader in providing financial advisory services to development stage oil sands companies," and that "CanWest Petroleum has made application to be listed on a Senior American Stock Exchange."

32.     On June 12, 2006, defendants issued a release entitled "CanWest Petroleum and Oilsands Quest enter into Agreement to Combine Companies," which stated in relevant part that,

> CanWest Petroleum Corporation and Oilsands Quest Inc. announced today that the companies have entered into an agreement (the "Agreement") that provides for the combination of CanWest Petroleum and Oilsands Quest (the "Combination"). Under the terms of the Agreement and subject to the approval of Oilsands Quest's shareholders, each common share of Oilsands Quest not already owned by CanWest Petroleum will be exchanged for 7.95 exchangeable shares of Oilsands Quest (the "Exchangeable Shares"), subject to adjustments. The rights, privileges and restrictions governing the Exchangeable Shares will provide that

each whole Exchangeable Share may be exchanged for a CanWest Petroleum share. Based on the closing price of CanWest Petroleum's common shares on Friday, June 9, 2006 (US $6.21), the exchange ratio implies a price of US $49.37 per Oilsands Quest share. The Combination would result in the creation of a company with a fully diluted market capitalization of approximately US $1.3 billion, based on the current trading value of CanWest Petroleum shares.

CanWest Petroleum owns a 59.5% interest, on a fully diluted basis, in Oilsands Quest, a private Alberta operating company that owns 100% of exploration permits covering 508,000 net acres in northwest Saskatchewan.

T. Murray Wilson, who joined CanWest Petroleum's board of directors as Chairman in May 2006 to lead a reorganization of such company, said, "This is an important step for CanWest Petroleum to be able to start capitalizing more effectively on its assets and building significant long-term value for its shareholders."

Christopher H. Hopkins, President and Chief Executive Officer of Oilsands Quest, said, "The Combination will allow shareholders of both companies to participate in a larger, stronger and more efficient company, with a greater ability to finance and accelerate the exploration program on Oilsands Quest's oil sands permits."

Full details of the Combination will be included in a proxy circular and related documents which will be mailed to Oilsands Quest shareholders for their consideration and approval. The Combination is expected to be completed on August 14, 2006 and is subject to regulatory approvals, the approval of Oilsands Quest's shareholders and other customary conditions contained in the Agreement.

33.    On July 21, 2006, defendants mailed a proxy circular to shareholders seeking approval of Oilsands Quest's acquisition of the minority interest in OQI Sask and filed the Company's Form 10KSB for the fiscal year ending April 30, 2006.  The Consolidated Balance Sheets stated the Company had $17,831,417 in "properties," including its interest in OQI Sask. The FY 2006 Form 10KSB also stated as to "Evaluation of Disclosure Controls and Procedures," that "[b]ased on an evaluation as of the end of the period covered by this annual report, the Company's principal executive officer and principal financial officer ha[d] concluded that the Company's disclosure controls and procedures  (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) [were] effective for the  purposes set

forth in such definition" and that the "Company's management ha[d] also concluded that the Company's disclosure controls and procedures [were] effective to ensure that information required to be disclosed in the Company's reports filed under the Exchange Act [was] accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure." The FY 2006 Form 10KSB was signed by Wilson as CEO and was certified by Wilson, both as CEO and CFO.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

The Class Period commences on August 14, 2006. On that day, the Company held a Special Meeting of Shareholders at 10:00 a.m. (MDT), at the Xchange Conference Centre, Suite 200, 639 – 5th Avenue South West, Calgary, Alberta, Canada, to consider Oilsands Quest's acquisition of the minority interest in OQI Sask pursuant to proxy materials mailed to shareholders on July 21, 2006 with the Company's false and misleading FY 2006 Form 10-K. Oilsands Quest's shareholders approved the acquisition of the minority interest in OQI Sask.

34.     On August 15, 2006, defendants announced that CanWest had "completed its combination transaction (the "Combination") with its subsidiary, Oilsands Quest Inc. As a result of the Combination, which was approved by the Oilsands Quest minority shareholders earlier today, CanWest Petroleum now owns 100 percent of the common voting equity shares of Oilsands Quest." The release also stated that "[e]ach common share of Oilsands Quest held by other shareholders was exchanged for 8.23 exchangeable shares of Oilsands Quest (the "Exchangeable Shares"), resulting in the issuance of 76,504,302 Exchangeable Shares on a fully diluted basis," that "TD Securities Inc. acted as financial advisor to CanWest Petroleum, and CIBC World Markets Inc. acted as financial advisor to Oilsands Quest," and that "Genuity Capital Markets provided the independent committee of the board of directors of Oilsands Quest

with its opinion that the consideration to be received by the shareholders of Oilsands Quest upon completion of the Combination was fair from a financial point of view to the shareholders of Oilsands Quest."

35.    On August 18, 2006, CanWest announced that "[t]he American Stock Exchange ('Amex') ha[d] approved the application by CanWest Petroleum Corporation (the 'Company') (OTCBB: CWPC) for the listing of the Company's common stock on Amex under the trading symbol 'BQI'."    The release also expressly stated that ***"[t]he Amex listing approval [was] contingent upon the Company being in compliance with all applicable listing standards on the date it beg[an] trading on Amex,*** and [might] be rescinded if the Company [was] not in compliance with such standards," and that "[t]he Company expect[ed] to begin trading on Amex on Thursday, August 24, 2006."

36.    On August 24, 2006, CanWest was added to the AMEX and Hopkins celebrated by participating in the opening bell ringing on the AMEX on August 29, 2006.

37.    On September 14, 2006, defendants filed the Company's 1Q 07 Form 10QSB with the SEC for the interim financial period ending July 31, 2006.    The Consolidated Balance Sheets stated the Company had $35,062,763 in "properties," including the OQI Oil Sands Exploration Permits.    As to management's "Evaluation of Disclosure Controls and Procedures," the 1Q 07 Form 10QSB stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."    The 1Q 07 Form 10QSB was signed by CEO Hopkins and certified by both CEO Hopkins and CFO Hirji.

38.     On October 31, 2006, the Company changed its name from Canwest to Oilsands Quest.

39.     On December 15, 2006, defendants filed the Company's 2Q 07 Form 10QSB with the SEC for the interim financial period ending October 31, 2006.  The Consolidated Balance Sheets stated the Company had $349,188,867 in "properties," including the OQI Oil Sands Exploration Permits.  *Of this, $319,022,948 was recorded for "Acquisition of minority interest."*  As to management's "Evaluation of Disclosure Controls and Procedures," the 2Q 07 Form 10QSB stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 2Q 07 Form 10QSB was signed and certified by both CEO Hopkins and CFO Hirji.

40.     On December 19, 2006, defendants filed a Form S-3 Shelf Registration Statement under the Securities Act of 1933 with the SEC.  The Form S-3 stated the Company had shareholders' equity of $398,219,293 and incorporated by reference Oilsands Quest's FY 2006 Form 10-K and 1Q and 2Q 2007 Forms 10-Q.  The Form S-3, signed by defendants Wilson, Hopkins and Hirji, registered almost 9 million additional shares of common stock and 66.7 million shares of common stock issuable upon exchange of Exchangeable Shares issued as consideration in the August 14, 2006 acquisition of the minority interest in OQI Sask.

41.     On March 7, 2007, the Company issued a release announcing the initial closing of a $30 million Cdn ($25.6 million US) private placement with a syndicate of underwriters on a "bought deal basis."  Oilsands Quest issued 3,097,534 common shares on a flow-through basis at

a price of $5.64 Cdn ($4.82 US) per share for gross proceeds of $17.5 million Cdn ($14.9 million US). The Company's release stated that "[t]here was significant participation by Oilsands Quest's Canadian directors, officers, executives, employees and associates, amounting to approximately $1.3 million Cdn," and that the remaining 2,222,466 common shares would be issued on a flow-through basis through the underwriters at a price of $5.64 Cdn ($4.82 US) per share in subsequent closings.

42.     On March 15, 2007, the Company filed its 3Q 07 Form 10QSB with the SEC for the interim financial period ending January 31, 2007.  The Consolidated Balance Sheets stated the Company had $355,759,401 in "properties," including the OQI Oil Sands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 3Q 07 Form 10QSB stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."   The 3Q 07 Form 10QSB was signed and certified by both CEO Hopkins and CFO Hirji.

43.     On April 17, 2007, the Company issued a release announcing "that it intend[ed] to issue shares of its common stock to investors in Canada and the United States pursuant to certain exemptions from prospectus requirements (the 'Common Shares') through a syndicate of underwriters," that "[p]ricing of the private placement [would] follow marketing to investors and [would] be determined in the context of the market," and that it was "expected that the total gross proceeds to Oilsands Quest [would] be approximately US$30 million."

44.     On April 18, 2007, the Company issued a release announcing that it had "agreed to terms of the previously announced private placement of its common stock to investors in Canada and the United States pursuant to certain exemptions from prospectus requirements (the 'Common Shares') through a syndicate of underwriters," and that "Oilsands Quest intend[ed] to issue 14 million common shares at a price of US$2.75 per share for aggregate gross proceeds of US$38.5 million."

45.     On April 30, 2007, the Company issued a release announcing "that, for the fiscal year beginning on May 1, 2007, the company [would] no longer be considered a small business issuer as defined by the Securities and Exchange Commission (SEC)" and that "[f]or periods ending *after May 1, 2007, the company [would] be required to file annual and quarterly reports on Forms 10-K and 10-Q in accordance with Regulation S-K of the SEC rules.*"

46.     On May 4, 2007, defendants filed a Form S-3 Shelf Registration Statement under the Securities Act of 1933 with the SEC.  The Form S-3 stated the Company had $389,350,335 in shareholders' equity and incorporated by reference Oilsands Quest's FY 2006 Form 10-K and 1Q, 2Q and 3Q 2007 Forms 10-Q.  The Form S-3, signed by defendants Wilson, Hopkins and Hirji, registered more than 3 million additional shares of common stock.

47.     On May 4, 2007, the Company also announced that it had completed the "two previously announced private placements of flow-through common stock and common stock," including issuing 13.9 million common shares on May 3, 2007 for gross proceeds of $38.2 million, the proceeds of which would be used "to repay debt incurred in conjunction with recently announced property acquisitions, and for pre-commercial recovery testing and analysis relating to its Axe Lake Discovery, working capital and general corporate purposes"; and a private placement of flow-through shares with a syndicate of underwriters on a bought deal

basis, issuing 2,164,166 flow-through common shares for gross proceeds of $12.2 million Cdn ($10.4 million US) on May 3, 2007.  The release also explained that "[t]ogether with previous closings on March 6, 2007 and March 9, 2007, the Company issued a total of 5,320,000 flow-through common shares in the underwritten flow-through share financing, for total gross proceeds of $30 million Cdn ($25.6 million US)," explaining that the "proceeds will be used to incur Canadian Exploration Expenses on resource delineation and other exploration work relating to Oilsands Quest Sask Inc.'s permit lands following the 2006-2007 winter exploration program. Oilsands Quest Sask Inc. is a subsidiary of Oilsands Quest."

48.     On July 30, 2007, defendants filed the Company's Form 10K for the fiscal year ending April 30, 2007.  The Consolidated Balance Sheets stated the Company had $520,301,141 in "properties and equipment" including the OQI Sask Oil Sands Exploration Permits.  The FY 2007 Form 10K also stated as to "Evaluation of Disclosure Controls and Procedures," that "[b]ased on an evaluation as of the end of the period covered by this annual report, the Company's principal executive officer and principal financial officer ha[d] concluded that the Company's disclosure controls and procedures  (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) [were] effective for the  purposes set forth in such definition" and that the "Company's management ha[d] also concluded that the Company's disclosure controls and procedures [were] effective to ensure that information required to be disclosed in the Company's reports filed under the Exchange Act [was] accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure."  The FY 2006 Form 10K was signed and certified by defendants Wilson as CEO and Hirji as CFO.

49.     On September 14, 2007, defendants filed the Company's 1Q 08 Form 10Q with the SEC for the interim financial period ending July 31, 2007.  The Consolidated Balance Sheets stated the Company had $524,235,842 in "property and equipment," including the OQI Sask. Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 1Q 08 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 1Q 08 Form 10Q was signed and certified by defendants Hopkins as CEO and Hirji as CFO.

50.     On November 20, 2007, the Company issued a release announcing that it had "commenced an overnight marketed public offering (the "Offering") of 25,000,000 units ("Units") and 4,000,000 common shares on a flow-through basis ("Flow-through Shares") in the United States under an effective shelf registration statement on file with the Securities and Exchange Commission ("SEC") and in all provinces of Canada, except Quebec, by way of the Multi-jurisdictional Disclosure System," that "[e]ach Unit [was] comprised of one common share (a "Share") and one-half of a common share purchase warrant of the Company (a 'Warrant') with each whole Warrant entitling the holder to purchase one Share of the Company for a period of 24 months following closing of the Offering," and that the "Offering [would] be priced in the context of the market with final terms of the Offering to be determined at the time of pricing." On November 21, 2007, the Offering was priced at US$5.00 per Unit and the offering of Flow-through shares was priced at Cdn $6.17 per Flow-through Share.

51.     On December 14, 2007, defendants filed the Company's 2Q 08 Form 10Q with the SEC for the interim financial period ending October 31, 2007.  The Consolidated Balance Sheets stated the Company had $618,631,964 in "property and equipment," including the OQI Sask Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 2Q 08 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 2Q 08 Form 10Q was signed and certified by defendants Hopkins as CEO and Hirji as CFO.

52.     On March 14, 2008, defendants filed the Company's 3Q 08 Form 10Q with the SEC for the interim financial period ending January 31, 2007.  The Consolidated Balance Sheets stated the Company had $597,959,253 in "property and equipment," including the OQI Sask. Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 3Q 08 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 3Q 08 Form 10Q was signed and certified by defendants Hopkins as CEO and Hirji as CFO.

53.     On May 12, 2008, the Company announced that it had entered into a private placement in which funds managed by Sprott Asset Management Inc. had agreed to purchase 11,904,761 treasury shares of Oilsands Quest common stock at a price of US$4.20 per share for

total gross proceeds to Oilsands Quest of approximately US$50 million. In addition, a number of other accredited investors had agreed to participate for another US$4.5 million at the same price per share, resulting in a total of 12,976,761 common shares issued and total gross proceeds of US$54.5 million.  The Company announced on May 23, 2008 that the private placement had been completed.

54.    On June 27, 2008, defendants filed the Company's Form 10K for the fiscal year ending April 30, 2008.  The Consolidated Balance Sheets stated the Company had $595,611,114 in "properties and equipment," including the OQI Sask. Oilsands Exploration Permits.  The FY 2008 Form 10K also stated as to "Evaluation of Disclosure Controls and Procedures," that "[b]ased on an evaluation as of the end of the period covered by this annual report, the Company's principal executive officer and principal financial officer ha[d] concluded that the Company's disclosure controls and procedures  (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) [were] effective for the  purposes set forth in such definition" and that the "Company's management ha[d] also concluded that the Company's disclosure controls and procedures [were] effective to ensure that information required to be disclosed in the Company's reports filed under the Exchange Act [was] accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure."  The FY 2008 Form 10K was signed and certified by defendant Hirji as CFO, defendant Hopkins as CEO, and was signed by defendant Wilson as Chairman.

55.    On September 7, 2008, defendants filed the Company's 1Q 09 Form 10Q with the SEC for the interim financial period ending July 31, 2008.  The Consolidated Balance Sheets stated the Company had $595,276,695 in "property and equipment," including the OQI Sask.

Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 1Q 09 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 1Q 09 Form 10Q was signed and certified by defendants Hopkins as CEO and Hirji as CFO.

56.    On September 22, 2008, the Company announced that it had entered into a non-brokered private placement flow-through share agreement with UTA Asset Management Corporation ("UTA") whereby Oilsands Quest would issue 5,142,857 shares of common stock on a flow-through basis (the "Flow-Through Shares") at a price of US$3.50 (CDN$3.675) per share to funds managed by or affiliated with UTA, for aggregate gross proceeds of US$18.0 (CDN$18.9) million.  The Company also announced that up to an additional 1,500,000 Flow-Through Shares might be issued to affiliates and employees of Oilsands Quest at the same price per share for additional aggregate gross proceeds of up to US$5.25 (CDN$5.5) million.

57.    On September 23, 2008, the Company announced that it had entered into a private placement financing agreement with a syndicate of underwriters on a bought deal basis, to issue 3,266,000 common shares on a flow-through basis ("Flow-Through Shares").  According to the Company's release, the Flow-Through shares would be issued to investors at a price of CDN$3.675 (US$3.50) per share, for total gross proceeds to Oilsands Quest of approximately CDN$12 million.

58.    On October 3, 2008, the Company announced that it had completed its previously announced non-brokered private placement of flow-through shares with UTA Asset Management

Corporation and that Oilsands Quest issued 6,008,156 shares of common stock on a flow-through basis (the "Flow-Through Shares") at a price of CDN$3.675 per share to funds managed by or affiliated with UTA (5,142,857 Flow- Through Shares) and to affiliates and employees of Oilsands Quest (865,299 Flow- Through Shares) for aggregate gross proceeds of CDN$22.1 million.

59.     On December 19, 2008, defendants filed the Company's 2Q 09 Form 10Q with the SEC for the interim financial period ending October 31, 2008.  The Consolidated Balance Sheets stated the Company had $509,923,969 in "property and equipment," including the OQI Sask. Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and Procedures," the 2Q 09 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition."  The 2Q 09 Form 10Q was signed and certified by defendants Hopkins as CEO and Hirji as CFO.

60.     On February 4, 2009, defendants filed a Form 8-K announcing "[o]n January 29, 2009, Mr. Hirji informed the Company that he is resigning from his position as the Chief Financial Officer effective February 23, 2009," and that "effective February 23, 2009, Garth Wong CA, [would] become the Company's Chief Financial Officer."

61.     On March 12, 2009, defendants filed the Company's 3Q 09 Form 10Q with the SEC for the interim financial period ending January 31, 2009.  The Consolidated Balance Sheets stated the Company had $502,314,208 in "property and equipment," including the OQI Sask. Oilsands Exploration Permits.  As to management's "Evaluation of Disclosure Controls and

Procedures," the 3Q 09 Form 10Q stated that "[b]ased on an evaluation as of the end of the period covered by this quarterly report, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective for the purposes set forth in such definition." The 3Q 09 Form 10Q was signed and certified by Defendants Hopkins as CEO and Wong as CFO.

**THE TRUTH BEGINS TO COME TO LIGHT**

62.    On July 14, 2009, defendants issued a release entitled "Oilsands Quest announces delay in annual report filing and intent to restate financial statements," disclosing that the Company's FY 2007, FY 2008 and Q-1, Q-2 and Q-3 2009 financial reports could not be relied upon, that those periods would be restated, and that its internal controls were deficient throughout this time period:

> Oilsands Quest Inc. announced today that it is extending until July 29, 2009 the date by which it must file its Form 10-K for the year ended April 30, 2009 by filing a Form 12b-25 with the United States Securities and Exchange Commission. ***The reason for the delay is that, during the preparation of its financial statements for the year ended April 30, 2009, the Company determined that it will revise the calculation of the consideration exchanged in the acquisition of the non-controlling interest of Oilsands Quest Sask Inc. ("OQI Sask") for the year ended April 30, 2007. The revision is due to a modification in the Company's interpretation of the generally accepted accounting principles related to the accounting for the purchase of a non-controlling interest when the consideration includes stock options and warrants of a subsidiary.***
>
> On August 14, 2006, the Company, pursuant to the terms of a reorganization agreement, acquired the non-controlling interest (35.92%) of OQI Sask which together with its 64.08% interest, resulted in a 100% interest in OQI Sask. In the accounting treatment of this transaction, the fair value of the stock options of OQI Sask at the time of the acquisition was included in the consideration exchanged for the non-controlling interest. ***Management has concluded that in accordance with a technical interpretation of the terms of FAS 123 (R), Share Based Payment, and FAS 141, Business Combinations, options of a subsidiary that are granted while the parent is in control of the subsidiary should be excluded from the consideration paid in the acquisition of the non-controlling interest.***

Genuity Capital Markets is not withdrawing the Fairness Opinion it gave at the time of the transaction.

Management, together with its independent auditors for the respective periods, is analyzing the impact of this revision on its previously reported financial statements. ***The Audit Committee of the Board of Directors has concluded that the Company's financial statements for the years ended April 30, 2007 and April 30, 2008 and the quarterly periods ended July 31, 2007 to January 31, 2009 will be restated and should no longer be relied upon. In addition, Pannell Kerr Forster's audit report on the financial statements for the year ended April 30, 2007 and KPMG LLP's report on the financial statements and effectiveness of internal controls over financial reporting for the year ended April 30, 2008 should no longer be relied upon.***

* * * *

***Management is also assessing the effect of this revision on the internal control over financial reporting and disclosure controls and procedures. Management does not expect to reach a conclusion on the controls until completion of the restatement process.***

[Emphasis added.]

63.    On July 29-30, 2009, the Company filed its restated its FY 2008, Q1 2009, Q2 2009 and Q3 2009 financial statements, and issued its FY 2009 financial report.  As to its internal controls, the Company's amended FY 2008 Form 10-K stated that

In connection with the audit of our consolidated financial statements for the year ended April 30, 2009, ***we and our independent registered public accounting firm identified deficiencies in our internal control over financial reporting that were "material weaknesses" as defined by standards established by the Public Company Accounting Oversight Board. The deficiencies related to our accounting for the August 2006 acquisition of a non-controlling interest of OQI Sask which together with our 64.08% interest resulted in a 100% interest in OQI Sask.*** We have restated our financial statements for the period ended April 30, 2008 and the interim periods from July 31, 2008 through January 31, 2009 to correct the accounting treatment for this acquisition.  However, we cannot assure you that our remediation of our internal control over financial reporting relating to the identified material weakness will re-establish the effectiveness of our internal control over financial reporting or that we will not be subject to material weaknesses in the future.

[Emphasis added.]

64.    The Company's amended FY 2008 Form 10-K reduced the Company's previously-reported properties and equipment by almost 23% for the FY ended April 30, 2008, **_or more than $136 million_** – reducing the previously reported "properties" from $595,611,114 to $459,492,571.

65.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Defendants failed to properly account for Oilsands Quest's acquisition of the minority interest of OQI Sask in August 2006, materially overstating the value of OQI Sask throughout the Class Period;

(b)    Oilsands Quest's financial statements overstated the value of the Company's interest in OQI Sask and were presented in violation of GAAP throughout the Class Period; and

(c)    The Company's internal controls were inadequate to prevent it from improperly inflating the value of its assets throughout the Class Period.

66.    As a result of defendants' false statements, Oilsands Quest's stock price traded at inflated levels during the Class Period, trading as high as $6.75 per share on June 23, 2008. However, after the truth seeped into the market, the Company's shares were hammered by massive sales, sending them down 87% from their Class Period high.

67.    The market for Oilsands Quest common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Oilsands Quest common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Oilsands Quest common stock relying upon the integrity of the market price of Oilsands

Quest common stock and market information relating to Oilsands Quest, and have been damaged thereby.

68.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Oilsands Quest common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

69.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Oilsands Quest's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Oilsands Quest and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Oilsands Quest stock was removed and the price of Oilsands Quest stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

70.    As alleged herein, Oilsands Quest and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Oilsands Quest, their control over, and/or receipt and/or modification of Oilsands Quest's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Oilsands Quest, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

71.    Oilsands Quest's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

72.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Oilsands Quest who knew that the FLS was false. None of the historic or present tense statements made by defendants were

assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICATION OF PRESUMPTION OF RELIANCE;
FRAUD ON THE MARKET**

73.    Plaintiff will rely upon the presumption of reliance established by the fraud-on the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Oilsands Quest common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

74.    At all relevant times, the market for Oilsands Quest common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Oilsands Quest filed periodic public reports with the SEC; and

(b)    Oilsands Quest regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

75.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Oilsands Quest common stock and operated as a fraud or deceit on Class Period purchasers of Oilsands Quest stock by misrepresenting the value of the Company's business and prospects by overstating its assets. Thus, instead of truthfully disclosing during the Class Period that Oilsands Quest's business was not as valuable as represented, defendants overstated the value of OQI Sask after Oilsands Quest's acquisition of the remaining minority interest in August 2006.  As the defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Oilsands Quest common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Oilsands Quest stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

76.     Plaintiff incorporates ¶¶1-75 by reference.

77.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Oilsands Quest common stock during the Class Period.

79.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Oilsands Quest common stock. Plaintiff and the Class would not have purchased Oilsands Quest common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

### COUNT II
### For Violation of §20(a) of the Exchange Act
### Against Oilsands Quest and the Individual Defendants

80.    Plaintiff incorporates ¶¶1-79 by reference.

81.    The Individual Defendants acted as controlling persons of Oilsands Quest within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Oilsands Quest stock, the Individual Defendants had the power and authority to cause Oilsands Quest to engage in the wrongful conduct complained of herein. Oilsands Quest controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 24, 2011

SCOTT+SCOTT LLP

DAVID R. SCOTT (DS 8053)
JOSEPH P. GUGLIELMO (JG 2447)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Phone: 212/223-6444
Fax: 212/223-6334
drscott@scott-scott.com
jguglielmo@scott-scott.com
MARY K. BLASY
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619/233-4565
Fax: 619/233-0508
mblasy@scott-scott.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Mark Rubenstein, hereby certify, as to the claims asserted under the federal securities laws, that:

1.     I am over the age of 18.  I have reviewed the complaint in this matter and authorize Scott+Scott LLP to file the complaint, and lead plaintiff papers, in this matter.

2.     I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.     I am willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.  I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.     My transactions in Oilsands Quest, Inc. securities that are the subject of this action are set forth below:

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 06/23/2008 | Buy | 200 | $6.61 |
| 06/24/2008 | Buy | 178 | $6.05 |
| 06/24/2008 | Buy | 22 | $6.05 |

5.     I have not sought to serve, nor have I been appointed as a lead plaintiff or representative party on behalf of a class in any action brought under the federal securities laws during the three-year period preceding the date of this Certification.

6.     I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ____ day of February, 2011.

_____
Mark Rubenstein

✓ Trades above are all accurate

1